**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Edward J Colteaux, et al.,<br>Plaintiffs,<br>v.<br>James Holmes, et al.,<br>Defendants. | No. CV-24-00380-TUC-JGZ<br>**ORDER** |

Plaintiffs Edward J. Colteaux and Karla Colteaux bring this action as the surviving parents of Edward Colin Colteaux ("Colin"). Colin was shot and killed by James Holmes in a hotel parking lot in Tucson, more than two hours after Holmes completed his shift as a United States Border Patrol Agent. In their First Amended Complaint ("FAC"), Plaintiffs assert four Federal Tort Claims Act (FTCA) claims against the United States[1]: battery; negligence; negligent hiring, retention, and/or supervision; and vicarious liability.[2] (Doc. 14.) Pending before the Court is the United States' Motion to Dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Doc. 38.) The government argues that it has not waived sovereign immunity because Holmes was off duty and not acting within the scope of his employment, that Plaintiffs' negligent hiring, training, and supervision claim is barred by the discretionary function exception, and that

---

[1] Because the only proper defendant in an FTCA action is the United States, the Court will dismiss United States Customs and Border Protection (CBP) as a defendant. *Allen v. Veterans Admin.*, 749 F.2d 1386, 1388 (9th Cir. 1984) ("Individual agencies of the United States may not be sued [under the FTCA]."); *see* 28 U.S.C. § 2679(a).

[2] Plaintiffs voluntarily dismissed a fifth claim—a *Bivens* claim against Holmes. (Docs. 54, 58.)

Plaintiffs' vicarious liability claim is redundant of their other claims. Plaintiffs contend that the Court cannot resolve the Motion until they have taken discovery. The Motion is fully briefed, and the Court heard argument on August 26, 2026. (Docs. 38, 43, 54, 55, 59, 60, 63, 66.) For the reasons that follow, the Court will grant the Motion.

## I. Legal Standard

The United States raises a factual attack on the Court's subject matter jurisdiction. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "[I]n a factual attack, the challenger disputes the truth of the allegations . . . themselves." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In resolving such an attack, the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment," and does "not presume the truthfulness of the plaintiff's allegations." *Id.* (citations omitted). The Court "may resolve those factual disputes itself." *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014).

Once the government has submitted evidence controverting the allegations, Plaintiffs may not rest on their pleadings. They must present competent evidence—material of the kind that would be admissible under Rule 56(c)—and they bear the burden of establishing each element of jurisdiction by a preponderance of the evidence. *Id.* at 1121; *United States ex rel. Solis v. Millenium Pharms., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018).

However, a court "must leave the resolution of material factual disputes to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Leite*, 749 F.3d at 1122 n.3; *see Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). In evaluating subject matter jurisdiction in such circumstances, the court must employ the standard applicable to a motion for summary judgment, and "the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987) (quoting *Augustine*, 704 F.2d at 1077) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a).

## II. Background[3]

The Shooting

At approximately 9:45 p.m. on October 9, 2021, Border Patrol Agent James Holmes shot and killed Colin in the parking lot of a Days Inn located next to a Denny's restaurant in Tucson, Arizona. (Doc. 14 ¶¶ 29–37; Doc. 60-3 at 3.)[4] Colin had been outside the hotel with friends. (Doc. 14 ¶ 29.) A Days Inn employee, Laurel Pavlik, asked the group to leave the property and followed them into the parking lot, where she and Colin argued. (*Id.* ¶¶ 30–31.)

Holmes had been having dinner at the adjacent Denny's with his mother, Iliana Holmes, and his girlfriend, Emily Rodgers. (*Id.* ¶ 33.) As the three entered Holmes's car and Holmes backed out of his parking space, Rodgers saw Pavlik and Colin arguing and began screaming that Colin was "going to kill" Pavlik. (*Id.* ¶¶ 35–36; Doc. 60-1 at 54, 56.) Holmes got out of the car, yelled "Stop!" at Colin, and fired seven rounds, striking Colin in the back and killing him. (Doc. 14 ¶ 37; Doc. 60-1 at 53–57.)[5]

//

---

[3] The account of the shooting is drawn largely from the FAC, which supplies the only narrative of the events in the parking lot and which the government does not dispute in the respects recited here. The facts concerning Holmes's employment—his shift, his assignment, the firearm, and CBP's policies—are drawn from the declarations and agency records the parties have submitted. Where Plaintiffs have asserted something to the contrary, the Court notes the assertion and the basis offered for it.

The record has developed since the pleadings closed. Plaintiffs filed the FAC without the benefit of discovery, with a FOIA request to CBP that the agency had not answered, and with Holmes having declined to give a statement to police; the FAC relies on the TPD Report and the witness accounts it contains. Several matters Plaintiffs initially placed in issue have since been addressed by the agency records the government produced with its Motion and its supplement. Plaintiffs no longer contend that Holmes was on shift, or that the weapon he fired was the one CBP issued to him. This Section reflects the record as it now stands.

[4] Record citations refer to the page numbers generated by the Court's CM/ECF filing system.

[5] The parties dispute what preceded the shooting. According to the TPD Report, Pavlik stated that Colin threatened her, came within a foot of her, pointed at her, and bent to pick up rocks she believed he was going to throw at her. (Doc. 60-1 at 130–31.) Rodgers stated that she told Holmes that Colin was going to hit Pavlik and that she saw Colin punch Pavlik. (*Id.* at 56, 131–32.) Plaintiffs maintain that Colin threw nothing and that no one was in danger, citing Detective Vazquez's report that "there were no visible gravel or rocks around [Colin's] body or in his hand." (Doc. 60-3 at 4; Doc. 60-1 at 53–57.) As explained in Part III.C, this dispute goes to the justification for the shooting and not to the scope of Holmes's employment.

<u>The Weapon</u>

The gun fired by Holmes was an H&K P2000 .40 caliber handgun bearing serial number 123-091842DE. (Doc. 60-1 at 11; Doc. 38-1 at 3 ¶ 7.) CBP did not issue that weapon to Holmes. (Doc. 59-1 ¶¶ 8–16; Doc. 59-2.) The only H&K P2000 ever issued to Holmes by CBP bore serial number 123083411. Holmes turned that weapon in on October 6, 2020, when he was issued a Glock G47. CBP transferred that H&K P2000 for disposal and destroyed it on or about January 29, 2021, more than eight months before the shooting. (Doc. 59-1 ¶¶ 8–14; Doc. 59-3.)[6] CBP was not issuing the H&K P2000 to its agents in October 2021, and there is no process by which CBP permits an employee to keep or purchase an agency-issued firearm. (Doc. 59-1 ¶¶ 7, 15.) Holmes told TPD that the weapon was an "off-duty firearm." (Doc. 38-1 at 18.)[7] The ammunition Holmes fired was recovered at the scene; its source is not established in the record.[8]

<u>Holmes's Shift and his Activity that Evening</u>

Holmes was a Border Patrol Agent assigned to the Tucson Station.[9] His scheduled shift on October 9, 2021 ran from 11:00 a.m. to 7:00 p.m.,[10] and he was not scheduled to

---

[6] The government's Reply states that the CBP-issued H&K P2000 was returned "on October 6, 2021." (Doc. 63 at 3 n.1.) The declaration and the underlying FACTS record both reflect October 6, **2020**. (Doc. 59-1 ¶¶ 8–9; Doc. 59-2.) The Court relies on the records. Plaintiffs' counsel quotes the correct date in his declaration, (Doc. 60 ¶ 10), but elsewhere argues that the Glock was issued on October 6, **2021**, "just three days prior to killing Colin," (Doc. 53-1 ¶ 14(j)). The record does not support that premise.

[7] Plaintiffs initially alleged that the firearm Holmes used was his CBP-issued service weapon. (Doc. 14 ¶¶ 37, 48, 55, 65.) Although Rodgers told TPD officers on scene that Holmes fired his duty weapon, TPD verified [with Border Patrol] that "the weapon that was fired was not his duty weapon but a personally owned weapon." (Doc. 60-1 at 53-54, 60.) A second firearm, a Sig Sauer P365, was recovered from Holmes's vehicle. (Doc. 38-1 at 3 ¶ 7; Doc. 60-1 at 14, 54.) Plaintiffs do not allege that the Sig Sauer was CBP-issued.

[8] Six projectiles, seven spent casings, and a magazine were recovered. (Doc. 60-1 at 6–8, 10, 13–15.) Plaintiffs reason that because CBP used the H&K P2000 for years, it would have maintained a supply of ammunition for it, and they seek discovery into the source of the rounds. (Doc. 60-3 at 7.) The source is immaterial for the reasons stated in Part III.D.3.

[9] In his declaration, Assistant Chief Patrol Agent Roberto Teran describes the Tucson Station's area of responsibility as 23.5 miles of international border plus a portion of interior Pima County. (Doc. 59-1 ¶ 2.) At the hearing, government counsel identified the Sasabe Port of Entry as Holmes's assigned area of patrol within the Tucson Station on October 9. (Doc. 68 at 25–26.)

[10] Both parties state that Holmes's shift ran from 10:00 a.m. to 8:00 p.m. (*See* Doc. 38-1 at 3 ¶ 8; Doc. 63 at 7.) The time records submitted with the Motion show a scheduled shift of 1100 to 1900. (Doc. 43 at 4.) The Court relies on the records. The discrepancy is immaterial; under either version Holmes was off shift when the shooting occurred, and under the records the interval between the end of the shift and the shooting is longer, not

work again until 11:00 a.m. the following day. (Doc. 43 at 4; Doc. 38-1 at 3 ¶ 8.) The shooting occurred roughly two hours and forty-five minutes after his shift was scheduled to end, at a hotel parking lot in Tucson and away from the area he was assigned to patrol. Plaintiffs' counsel confirmed at oral argument that there is no dispute on this point: "I don't think there is a dispute that when he was in Denny's and came out and shot Colin he was not in his work shift." (Doc. 68 at 38.)

At the time of the shooting, Holmes was on personal business. He had just finished a meal with his mother and his girlfriend. (Doc. 14 ¶ 33.) He was wearing a "blue plaid long sleeve shirt" and "dark wash pants," not a CBP uniform, and had driven a Rav4 that TPD identified as his own, not a CBP vehicle. (Doc. 60-1 at 54, 57.) There is no evidence or allegation that CBP directed Holmes to intervene or assigned, detailed, or called him to duty in connection with what was occurring in the hotel parking lot.

<u>The Nature of Holmes's Work</u>

Border Patrol agents "are not employed as peace officers," and "[t]heir power and authority to make arrests are prescribed by regulation." (Doc. 38-1 at 3 ¶ 5.) The Border Patrol Agent Position Description provides that agents are tasked with enforcing the laws that protect the homeland "by the detection, interdiction, and apprehension of those who attempt to illegally enter or smuggle any person or contraband across our Nation's sovereign borders." (*Id.* ¶¶ 2, 5 & Attach. A.) The mission of the Border Patrol is "to protect our Nation by reducing the likelihood that dangerous people and capabilities enter the United States between the ports of entry." (*Id.* ¶ 4.) Asked at oral argument whether there was any issue of fact about the nature of the work Holmes performed while on shift, Plaintiffs' counsel answered that there was not. (Doc. 68 at 38.)[11]

<u>After the Shooting</u>

According to the TPD Report, when TPD Officer Pena arrived at the Days Inn Hotel, he located a male "who is an off-duty Border Patrol Agent, holding a weapon in one hand

---

shorter.

[11] Plaintiffs argue from the Position Description that Holmes's duties were broader than the government describes. (Doc. 60-3 at 9 (citing Doc. 38-1 at 7, 13).) That argument is addressed in Part III.D.2.

and a badge in the other hand." (Doc. 60-1 at 53.)[12] Holmes was detained and declined to give a statement to police. (Doc. 14 ¶ 40; Doc. 60-1 at 54, 57, 134.)[13] He telephoned CBP after the shooting, and CBP personnel came to the scene. (Doc. 14 ¶ 39; Doc. 60-1 at 103.) The TPD Report records that "CBP leadership was arriving at the scene and demanding to become involved in the investigation and have access to the agent who discharged a handgun while off duty," and that TPD did not accede to the request at the scene. (Doc. 60-1 at 134.) Holmes was transported to the police station and later released to Agent Kusek of CBP. (Doc. 60-1 at 18, 54, 103, 135; Doc. 60-3 at 15.) CBP's Standards of Conduct require an employee who exercises law enforcement authority, who is "off-duty and not acting in an official capacity," and who is questioned or detained as the subject of an enforcement action, to report the contact within 48 hours.[14]

Procedural Background

Plaintiffs' counsel submitted a FOIA request to CBP on April 4, 2023 concerning the events of October 9, 2021. CBP acknowledged the request but has produced no documents in response. (Doc. 60-3 at 4; Doc. 60 ¶ 12.) No discovery has been conducted in this action.

## III. DISCUSSION

### A. The FTCA's Waiver of Sovereign Immunity

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Where the United States has waived its immunity, the terms of the waiver define the court's jurisdiction. *Id.* The FTCA "allows a plaintiff to bring certain state-law tort suits against the Federal

[12] Plaintiffs describe this as Holmes having "brandished his CBP badge at the time of the incident," citing the same page. (Doc. 60-3 at 10 (citing Doc. 60-1 at 53).) The page records what Officer Pena observed on arrival, which was after the shooting. The record contains no account of a display of a badge to Colin or to anyone else beforehand. The significance of the display that did occur is addressed in Part III.D.3.

[13] Officer Lockwood's notes record that Holmes stated, "I shot him. He was throwing rocks at the female," and that Holmes had placed a new magazine into the firearm after the shooting. (Doc. 60-1 at 21–22.)

[14] *CBP Standards of Conduct*, CBP Directive 51735-013B, https://www.cbp.gov/sites/default/files/2024-09/exhibit_08_-_cbp_directive_51735-013b_standards_of_conduct.pdf (last visited July 16, 2026).

Government." *Brownback v. King*, 592 U.S. 209, 210–11 (2021) (citing 28 U.S.C. §§ 1346(b), 2674). Federal courts have jurisdiction under the FTCA if the claim is:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* at 212 (quoting *Meyer*, 510 U.S. at 477); *see also J.P. v. United States*, 679 F. Supp. 3d 911, 920 (D. Ariz. 2023) ("To . . . invoke the [c]ourt's subject matter jurisdiction under the FTCA, [p]laintiffs must plausibly allege all six elements of [§] 1346(b)."). Only the fifth element is at issue here.

**B. Arizona law supplies the scope of employment standard.**

Whether a government employee acted within the scope of his office or employment is determined "according to the law of [the] state where the alleged tort occurred." *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010); *see also* 28 U.S.C. § 1346(b)(1). The parties agree that Arizona law governs. (Doc. 60-3 at 13; Doc. 63 at 2.)

In Arizona, an employer is vicariously liable for an employee's work-related torts "only if the employee is acting 'within the scope of employment' when the accident occurs." *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 601 ¶ 9 (Ariz. 2012). *Engler* adopted the test set out in the Restatement (Third) of Agency § 7.07:

> An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

Restatement (Third) of Agency § 7.07(2) (2006); *Engler*, 280 P.3d at 602 ¶ 13.[15] The provision identifies two circumstances in which conduct falls within the scope of

[15] Some Arizona courts continue to apply a materially similar test derived from Restatement (Second) of Agency § 228. *See Doe v. Roman Cath. Church of the Diocese of Phx.*, 533 P.3d 214, 222 ¶ 33 (Ariz. Ct. App. 2023). The outcome here is the same under either formulation.

employment: the employee is performing work the employer assigned, or he is engaged in a course of conduct the employer has the right to control.

In determining whether an employer exercised actual control or retained the right to control the employee's conduct, *Engler* identified four factors drawn from earlier Arizona decisions: "whether the act (a) was the kind the employee was hired to perform, (b) was commonly done by the employee, (c) occurred within the employee's working hours, and (d) furthered the employer's purposes or fell outside the employer's 'enterprise.'" 280 P.3d at 602 ¶ 11 (citing *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 461 (Ariz. Ct. App. 2007), and *Anderson v. Gobea*, 501 P.2d 453, 456 (Ariz. Ct. App. 1972)). The *Engler* factors inform the second inquiry under § 7.07(2)—whether the conduct was subject to the employer's control.

The inquiry is objective. "Whether a person acted in the scope of employment is not a question of subjective intent, but instead is determined by an objective test." *Ortiz v. Clinton*, 928 P.2d 718, 723 n.2 (Ariz. Ct. App. 1996). What the employee believed about his own authority does not bring his conduct within the scope of employment.

Scope of employment is ordinarily a question of fact, but "[i]t is a question of law . . . if the undisputed facts indicate that the conduct was clearly outside the scope of employment." *Doe*, 533 P.3d at 222 ¶ 33 (quoting *Smith v. Am. Express Travel Related Servs. Co.*, 876 P.2d 1166, 1171 (Ariz. Ct. App. 1994)); *see Ortiz*, 928 P.2d at 722 ("When material facts are not in dispute, a trial court may decide as a matter of law whether an employee was acting in the scope of employment at the relevant time."); *cf. Anthony v. United States*, 632 F. Supp. 3d 1017, 1040–41 (D. Ariz. 2022) (denying summary judgment where disputed facts existed as to whether the conduct was clearly outside the scope of employment).

**C. The jurisdictional question is not intertwined with the merits.**

Plaintiffs contend that scope of employment is inextricably intertwined with the merits because scope is both a jurisdictional prerequisite under § 1346(b)(1) and a predicate to the United States' liability under Arizona respondeat superior law. (Doc. 60-3 at 12–13.)

On that premise, they say, the Court must defer the jurisdictional determination, apply the summary judgment standard, or hold an evidentiary hearing after discovery. (*Id.*)

The governing standard asks whether "the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits." *Safe Air*, 373 F.3d at 1039 (quoting *Sun Valley Gas., Inc. v. Ernst Enters.*, 711 F.2d 138, 139 (9th Cir. 1983)). *Augustine* demonstrates the character of the dependence the standard contemplates. Jurisdiction there turned on when the plaintiff's FTCA claim accrued under 28 U.S.C. § 2401(b), which in turn depended on when he discovered, or should have discovered, that his dentists' failure to diagnose, treat, or warn him had caused his condition to deteriorate. 704 F.2d at 1077–78. That question, the Ninth Circuit explained, "depend[ed] upon whether the attending dentists properly diagnosed Augustine's condition and adequately informed him of the need to obtain prompt supplemental care, issues which go to the heart of Augustine's negligence action under the FTCA." *Id.* The court could not fix the accrual date without deciding the adequacy of the diagnosis and the warning—the very questions the negligence claim posed.

The standard therefore requires that the jurisdictional question be *dependent* on the resolution of merits facts, not merely that the two inquiries draw on related subject matter. A broader rule—under which a jurisdictional requirement is intertwined with the merits whenever it is also necessary to recovery—would sweep in every element of § 1346(b)(1) in every FTCA case and would be difficult to reconcile with the settled practice of resolving scope of employment on Rule 12(b)(1) motions. *Cf. Two Eagle v. United States*, 57 F.4th 616, 621 (8th Cir. 2023) (holding that scope of employment is "a threshold jurisdictional issue properly resolved via a Rule 12(b)(1) motion" and "is a separate question from whether [the employee] acted negligently").[16]

[16] Courts differ on what intertwinement means. *See CNA v. United States*, 535 F.3d 132, 143 (3d Cir. 2008), *as amended* (Sept. 29, 2008) (noting that the Ninth Circuit focuses "on overlapping issues of proof," while other courts ask whether the elements of jurisdiction and of the cause of action are coextensive). Decisions in the latter group have found scope of employment intertwined with the merits of an FTCA claim on the grounds that state respondeat superior law makes scope necessary to the employer's liability. *See Kerns v. United States*, 585 F.3d 187, 194–96 (4th Cir. 2009); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). This Court applies the *Augustine* standard.

The proof does not overlap here. The facts bearing on scope concern the relationship between Holmes's conduct and CBP's business: his shift and its hours, his duty station and assigned duties, the agency's authority and policies, the ownership of the firearm and the vehicle, and what CBP directed him to do. The facts bearing on liability concern what happened in the parking lot: whether Holmes acted intentionally and made harmful or offensive contact, *Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 438 ¶ 9 (Ariz. 2003), and whether he breached a standard of care that caused compensable injury, *Gipson v. Kasey*, 150 P.3d 228, 230 ¶ 9 (Ariz. 2007).

Neither set of facts answers the other. The Court can determine that CBP neither assigned nor had the right to control what Holmes did outside the Denny's without deciding whether what he did was tortious—indeed, without disturbing Plaintiffs' allegation that it was. Resolving the rock-throwing dispute in Plaintiffs' favor would not move Holmes's conduct inside the scope of his employment; resolving it in the government's favor is unnecessary to the Court's holding. That is what distinguishes this case from *Augustine*, where a single question decided both. Plaintiffs are correct that scope of employment is a predicate to the United States' liability under Arizona respondeat superior principles as well as a jurisdictional requirement. *See Engler*, 280 P.3d at 602 ¶ 13. But under *Augustine* the inquiry is whether the proof overlaps, not whether a jurisdictional requirement is also necessary to recovery. 704 F.2d at 1077–79.

In any event, a finding of intertwinement would change the standard, not the outcome. The Court would apply the standard governing summary judgment, could not resolve genuine disputes of material fact against Plaintiffs, and the government would "prevail only if the material jurisdictional facts are not in dispute and [it] is entitled to prevail as a matter of law." *Trentacosta*, 813 F.2d at 1558 (quoting *Augustine*, 704 F.2d at 1077). The material jurisdictional facts are not in dispute. The government supported its factual attack with declarations and agency records; Plaintiffs failed to present evidence controverting them and confirmed the two most significant facts at oral argument. Where the record discloses no genuine dispute, the motion is granted notwithstanding

intertwinement, though the dismissal is then properly characterized as a judgment on the merits. *Safe Air*, 373 F.3d at 1039–40. Intertwinement is also not itself a ground for discovery; the availability of jurisdictional discovery is governed by the separate standard addressed in Part III.E.

**D. Holmes was not acting within the scope of his employment.**

Neither circumstance identified in § 7.07(2) describes Holmes's conduct on the night of October 9, 2021.

1. <u>Holmes was not performing work assigned by CBP</u>.

Plaintiffs' theory is that CBP's policies made armed off-duty intervention part of Holmes's job—that the Use of Force Handbook authorizes agents "[i]n threatening, emergent situations . . . to use any available weapon, device or technique in a manner that is reasonable and necessary for self-defense or the defense of another person," and that the carriage of a CBP firearm is governed by the Handbook whether the agent is on or off duty. (Doc. 60-3 at 10–11.)[17]

The provision Plaintiffs invoke governs the carriage of *a CBP firearm*. Holmes carried none. The Handbook elsewhere disclaims any application to what Holmes was in fact doing, providing that nothing in it "shall be construed as interfering with the rights that Authorized Officers/Agents may have as private citizens to carry a personally-owned firearm off-duty for personal use." (*Id.* at 11 (quoting Handbook ch. 1, § H(1)).) More fundamentally, a policy addressed to what an agent may do if he finds himself in a dangerous situation is not an assignment of work. It does not direct an agent to seek such situations out, and it does not convert every act an armed agent takes on his own time into an act performed for his employer. *See McCloud v. State*, 170 P.3d 691, 701 (Ariz. Ct. App. 2007) (reasoning that off-duty officers are not "always . . . acting within the scope of [their] employment merely because some potential duty to act could arise"); *Hyun Ju Park v. City & Cnty. of Honolulu*, 292 F. Supp. 3d 1080, 1092, 1103 (D. Haw. 2018) (holding officer

[17] CBP Use of Force Handbook ch. 1, §§ B(1), C(1), https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/cbp-use-of-force-admin-guide-procedure-handbook_4500-002B.pdf (last visited July 17, 2026).

acted outside the scope of employment notwithstanding a department policy requiring officers to carry firearms at all times). Plaintiffs point to no order, assignment, detail, or call to duty connecting CBP to Holmes's actions in the hotel parking lot. It is undisputed that Holmes was off shift, and Plaintiffs do not contend that CBP directed him to intervene.

2. Holmes was not engaged in a course of conduct subject to CBP's control.

CBP had no right to control what Holmes did after his shift ended: where he ate dinner, what he wore, what he drove, what he carried, or whether he got out of his car. It furnished him none of the instrumentalities he used—not the vehicle, clothing, or firearm. The four *Engler* factors confirm that conclusion.

a. *The Kind of Act Holmes was Hired to Perform, and the Acts he Commonly Performed*

"As federal officers, Border Patrol agents are limited to their statutory powers"—the enforcement of the nation's immigration and customs laws. *United States v. Juv. Female*, 566 F.3d 943, 948–49 (9th Cir. 2009) (citations omitted) (explaining that Border Patrol agents are not "general law enforcement officers" or "general guardians of the public peace"). Holmes was hired to detect, interdict, and apprehend those attempting to enter the country unlawfully or to smuggle persons or contraband across the border. (Doc. 38-1 at 2-3 ¶¶ 2, 5.) His decision to intervene in an argument between a hotel clerk and Colin bore no relation to those duties. *Cf. Lam Gallegos v. United States*, No. 14-CV-136, 2021 WL 12307470, at *14 (S.D. Tex. Sept. 15, 2021) (holding Border Patrol agent's use of deadly force "in the course of interdicting an individual attempting to unlawfully enter the United States fell within the scope of his general authority," where the agent was on duty, patrolling the border in a government vehicle alongside a government co-worker). Nor was intervention of this kind something Holmes would commonly do as an agent; Plaintiffs do not identify anything suggesting otherwise.

Plaintiffs respond that the Position Description itself contemplates broader duties. They point to provisions stating that an agent may be called upon to participate in interagency task force operations with federal, state, and local agencies, and to "identify individuals suspected of violating immigration, Customs, and other laws," and to the

classification of the position as "a front line law enforcement officer position" for federal retirement purposes. (Doc. 60-3 at 9 (citing Doc. 38-1 at 7, 13).) None of this assists them. Task force participation is assigned work, undertaken at the agency's direction; nothing in the record suggests Holmes was serving in any such capacity that evening. (*See* Doc. 63 at 5.) The reference to "other laws" appears in a provision describing the identification of persons suspected of violations encountered in the course of the agent's immigration and customs duties, and a retirement classification describes a category of federal employment, not the content of an agent's assignment. That an agent may on some occasions be detailed to broader duties does not make everything he does off duty agency work.

b. *Working Hours*

The act did not occur within Holmes's working hours. His shift had ended, he had eaten a personal meal with his family, and he was not due back at work until the following morning. *See Engler*, 280 P.3d at 602–03 (holding employee was outside the scope of employment when traveling to and from a restaurant during off hours); *Driscoll v. Harmon*, 601 P.2d 1051, 1052–53 (Ariz. 1979) (holding active duty Air Force member was not acting within the scope of employment when, having finished his shift, he drove his personal vehicle toward his off-base residence); *Allstate Ins. Co. v. United States*, No. CIV 06-089-GEE, 2006 WL 3391331, at *3 (D. Ariz. Nov. 21, 2006) (holding Air Force captain who was "off-duty, in civilian clothes, [and] driving from his apartment to the mall for dinner" was outside the scope of employment, notwithstanding that he drove a government-owned vehicle).

Plaintiffs answer that proximity in time can suffice, relying on *Frison v. United States*, No. 21-cv-01618, 2024 WL 3640336 (D. Or. July 18, 2024) (findings and recommendation), *adopted*, 2024 WL 3640148 (D. Or. Aug. 2, 2024), in which a CBP agent was found to have been acting within the scope of his employment although his shift had not yet begun. (Doc. 60-3 at 14.) Nearness to a shift is not what placed the agent's conduct within the scope of his employment in *Frison*, and it does not do so here. The agent there had been detailed to Portland on assignment; the government selected and paid

for his lodging and meals, he had no days off, he was on call at all times between shifts, and the preparation and maintenance of his duty gear was part of his job. *Frison*, 2024 WL 3640336, at *2. He was readying that service-issued gear half an hour before reporting for his shift, and the court described him as "on-call and . . . actively preparing his gear in imminent anticipation of reporting for duty within the hour." *Id.* at *2–3.[18] Holmes was in none of those positions. His shift had ended, he was not on call, he was not at a duty station or in agency-assigned lodging, he had no CBP equipment with him, and he was not preparing for anything. He had finished a personal meal with his mother and his girlfriend and was driving out of a parking lot.[19]

c. *Furtherance of CBP's Purposes*

Intervening in an argument between a hotel clerk and a man in a parking lot did not further the Border Patrol's mission of reducing the likelihood that dangerous people and capabilities enter the United States. (Doc. 38-1 at 2 ¶ 4.) The conduct fell outside CBP's enterprise altogether. *See Allstate*, 2006 WL 3391331, at *3; *cf. Carcamo-Lopez v. Does 1 through 20*, 865 F. Supp. 2d 736, 751–52 (W.D. Tex. 2011) (holding Border Patrol agent acted in furtherance of the agency's mission when driving in the desert along the border to pursue and detain persons entering unlawfully).

//

//

//

---

[18] Although the agent was authorized to carry his firearm 24 hours a day and required to keep it within reach or secured at all times, those facts did not carry the holding. 2024 WL 3640336 at *2. *Frison* thus confirms what Part III.D.1 explains: a policy governing how an agent carries and maintains a CBP firearm does not itself bring off-duty conduct within the scope of employment.

[19] The *Frison* court declined to treat on-call status as dispositive, explaining that the inquiry "does not rely on bright-line rules" and that the agent's on-call status was "just one of many" circumstances. 2024 WL 3640336, at *3. It distinguished *Sharrock v. United States*, No. 08-cv-00013, 2010 WL 2278580, at *9 (D. Guam June 3, 2010), *aff'd*, 673 F.3d 1117 (9th Cir. 2012), in which a military officer "technically on-call around the clock" was outside the scope of his employment when he crashed his personal vehicle on the way to a voluntary basketball practice, and it cited *Clamor v. United States*, 240 F.3d 1215, 1217 (9th Cir. 2001), in which an employee was outside the scope because he was "off duty when the accident occurred" and "was not engaged in any errand for his employer, but was leaving work and free to do whatever he wished." *Frison*, 2024 WL 3640336, at *3. The description in *Clamor* fits Holmes.

3. Plaintiffs' Remaining Arguments

a. *The Badge and CBP's Response to the Scene*

Plaintiffs argue that Holmes's display of his badge, and CBP's conduct after the shooting—its personnel arriving at the scene, seeking access to Holmes, and coordinating his release from the station—show that CBP regarded him as acting within the scope of his employment. (Doc. 60-3 at 10.) Both events followed the shooting. Scope of employment is measured by reference to the act at the time it occurred, and neither what Holmes displayed to responding officers nor what his agency did in response establishes that CBP assigned or controlled his conduct when he fired at Colin on October 9. The agency's response is in any event accounted for by its Standards of Conduct, which require an employee who is "off-duty and not acting in an official capacity" to report a law enforcement contact of this kind. The policy presupposes off-duty status.

b. *Holmes's Subjective Belief*

Plaintiffs assert that Holmes believed he was acting within the scope of his employment. (Doc. 60-3 at 10.) In his declaration, counsel states he is "informed and believe[s]" Holmes has taken that position with CBP. (Doc. 60 ¶ 16.) Counsel does not claim personal knowledge, identify his source, or say when, to whom, or in what form Holmes is supposed to have said so. A declaration offered on such a motion must be made on personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4); *see Leite*, 749 F.3d at 1121–22. This one satisfies neither requirement. It is also immaterial: the inquiry is objective, and Holmes's view of his own authority cannot bring his conduct within the scope of his employment. *Ortiz*, 928 P.2d at 723 n.2. To the extent Plaintiffs relied at argument on the second sentence of § 7.07(2), (Doc. 68 at 5–7), that provision operates to remove conduct from the scope of employment, not to bring conduct within it.

Because the undisputed facts show that Holmes's conduct was clearly outside the scope of his employment, the question is one of law. *Doe*, 533 P.3d at 222 ¶ 33; *Ortiz*, 928

P.2d at 722. The Court lacks subject matter jurisdiction over Counts I, II and III.[20] Count IV, which pleads vicarious liability, fails for the same reason and independently because vicarious liability is a theory of recovery rather than a separate cause of action.

**E. Plaintiffs' Requests for Jurisdictional Discovery and an Evidentiary Hearing**

Plaintiffs do not argue that the present record establishes Holmes acted within the scope of his employment. They argue that the Court cannot decide the question until they have taken discovery, and their opposition is largely a list of subjects to be developed: the provenance of the weapon and CBP's practices for disposing of retired firearms; the source of the ammunition; how Assistant Chief Patrol Agent Teran's declarations and exhibits were prepared; CBP's off-duty carriage policies; the training Holmes received; whether his conduct benefited CBP; his own intent; and the circumstances of his removal from the scene. (Doc. 60-3 at 6–11; Doc. 53-1 ¶¶ 14–19; Doc. 68 at 3–13, 32–36.) Plaintiffs identify no statement in either Teran declaration they contend is false.

"Jurisdictional discovery 'should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 864 (9th Cir. 2022) (quoting *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003)). But "[d]iscovery is necessary . . . only if it is possible that the plaintiff can demonstrate the requisite jurisdictional facts if afforded that opportunity"; "[w]here . . . the extra-pleading

[20] As to Count III, this Court recognizes that the Ninth Circuit has identified circumstances where district courts have subject matter jurisdiction over FTCA claims of negligent hiring, training, and supervision where a government employee committed assault or battery. *See Senger v. United States*, 103 F.3d 1437, 1441 (9th Cir. 1996) (collecting cases). However, these cases distinguish negligence claims based *entirely* on a respondeat superior theory of liability (where the United States *cannot* be liable under the FTCA for intentional torts committed by government employees) from "independent negligent acts or omissions by the government that are proximate causes of harm" (where the United States *can* be liable). *Id.* In any event, having determined that Holmes was not acting within the scope of his employment, the Court need not determine whether Defendants' alleged negligence was the proximate cause of Holmes' conduct. Nor does the Court need to address Defendants' alternative argument that Count III is barred by the FTCA's discretionary function exception. Plaintiffs do not argue that their negligent hiring, training, and supervision claim can continue if Holmes was not acting within the scope of employment. (*See* Doc. 60-3); *see also Brownback*, 592 U.S. at 212 (explaining that FTCA claims are actionable only if the government employee was acting within the scope of their employment).

material demonstrates that the controlling questions of fact are undisputed, additional discovery would be useless." *St. Clair v. City of Chico*, 880 F.2d 199, 201–02 (9th Cir. 1989). A "mere hunch that discovery might yield jurisdictionally relevant facts" will not suffice. *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 507 (9th Cir. 2023) (internal quotation marks omitted) (quoting *LNS Enters.*, 22 F.4th at 864–65). A party seeking jurisdictional discovery in the face of a specific, record-supported showing must demonstrate how the discovery would allow it to contradict that showing. *See Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (holding district court did not abuse its discretion in denying jurisdictional discovery where the plaintiff "failed to demonstrate how further discovery would allow it to contradict the affidavits"); *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (affirming denial of a request "based on little more than a hunch that it might yield jurisdictionally relevant facts").[21]

Several of the subjects Plaintiffs identify concern facts that are not controverted: the timing of the shift, the ownership of the firearm, and what occurred after the shooting. *See* Part II. Others would not affect the analysis in Part III.D whatever discovery produced. Counsel acknowledged as much as to the ownership of the firearm: asked whether, if the weapon was no longer CBP property, it would matter to the scope argument whether a disposition policy existed and was followed, he answered, "assuming all of those facts, no, Your Honor." (Doc. 68 at 37.) The same is true of the ammunition, which counsel likewise acknowledged would not by itself place the act within the scope of employment (*Id.* at 7), and which, for the reasons stated in Part III.D.3, does not bear on control in any event. Holmes's intent is foreclosed by Arizona law. *Ortiz*, 928 P.2d at 723 n.2. And a policy keeping agents armed and available would not supply the missing element: in *Hyun Ju Park*, the department affirmatively required officers to carry firearms at all times, and the court still held that an off-duty officer handling his service weapon in a bar acted outside the scope of his employment. 292 F. Supp. 3d at 1092, 1103. Training bears on how

[21] *Terracom* and *Boschetto* address discovery directed to personal jurisdiction, but the Ninth Circuit applies the same formulation to jurisdictional discovery generally. *See Boschetto*, 539 F.3d at 1020 (quoting *Laub*, 342 F.3d at 1093).

competently Holmes acted, not on whether CBP assigned the act or retained the right to control it, and no training record could establish the duty that Arizona law does not impose on Count III. *See supra* note 19.

A generalized doubt about the reliability of sworn testimony and the agency records supporting it does not controvert a jurisdictional fact. *See St. Clair*, 880 F.2d at 201–02; *Terracom*, 49 F.3d at 562. Here, Plaintiffs seek to test the government's evidence rather than show it is controverted. To support their discovery request on the scope of employment question, Plaintiffs again rely on *Frison*. Just as discovery in *Frison* helped the court resolve the scope question in that case—the CBP officer had not yet formally started his shift, but acted within the scope of his employment because he was "on-call" and preparing his duty gear and agency-issued firearm for his impending shift—here too, Plaintiffs suggest, discovery *could* unearth new facts that might bring Holmes's conduct within the scope of employment. (Doc. 60-3 at 14.) Plaintiffs' jurisdictional discovery arguments fail to move beyond speculation and rely on facts from *Frison* that are distinguishable from those already established in this case. *See* Part III.D.2.b. ("[Holmes's] shift had ended, he was not on call, he was not at a duty station or in agency-assigned lodging, he had no CBP equipment with him, and he was not preparing for anything. He had finished a personal meal with his mother and his girlfriend and was driving out of a parking lot."). Nor does the pendency of Plaintiffs' unanswered FOIA request supply the missing showing; Plaintiffs do not explain how the receipt of additional agency records would allow them to contradict the existing agency records showing Holmes was off duty and used a personal firearm.

Because each subject on which Plaintiffs seek discovery is either uncontested or immaterial, additional discovery would be useless. *St. Clair*, 880 F.2d at 201–02. Plaintiffs have failed to demonstrate how the proposed additional discovery would allow them to contradict the specific, record-supported showing that Holmes was not acting within the scope of his employment. *See Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) Consequently, the request for jurisdictional discovery will be denied.

Plaintiffs alternatively request an evidentiary hearing. (Doc. 60-3 at 2, 13, 17; Doc. 60 ¶¶ 13, 22.) The Court heard argument on August 26, 2026. Plaintiffs have not identified any witness they would call or evidence they would offer at a hearing beyond the discovery they seek. Because that discovery would not bear on the analysis above, a hearing would serve no purpose.

## IV. Leave to Amend

Plaintiffs request leave to amend in the event the Court finds any claim insufficiently pleaded. (Doc. 60-3 at 2, 12, 17.) The Court does not dismiss any claim on the sufficiency of the pleadings. As to Counts I, II, and III, the defect is jurisdictional and rests on evidence outside the complaint; no allegation Plaintiffs could add would establish that CBP assigned Holmes's conduct or had the right to control it. Amendment would be futile, and leave will be denied.

## V. CONCLUSION

For the reasons explained above,

**IT IS ORDERED** that the United States' Motion to Dismiss (Doc. 38) is **GRANTED**. Counts I, II, and III are **DISMISSED** because Holmes was not acting within the scope of his employment. Count IV is **DISMISSED** for failure to state a claim because it is redundant of the FTCA negligence claim in Count II and because Holmes was not acting within the scope of his employment.

**IT IS FURTHER ORDERED** that Plaintiffs' requests for jurisdictional discovery, for an evidentiary hearing, and for leave to amend are **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and close this case.

Dated this 29th day of September, 2026.

Jennifer Zipps

Jennifer G. Zipps
Chief United States District Judge